[999 NYS2d 375]

CITIBANK, N.A., Appellant, v BERYL M. BARCLAY, Respondent, et al., Defendants.

First Department, December 11, 2014

### APPEARANCES OF COUNSEL

*Hogan Lovells US LLP*, New York City (*Chava Brandriss, David Dunn* and *Robin L. Muir* of counsel), for appellant.

*Common Law, Inc.*, Sunnyside (*Karen Gargamelli* and *Jay Kim* of counsel), for respondent.

### OPINION OF THE COURT

ANDRIAS, J.

In June 1994, defendants Barclay and Hoggard borrowed the principal sum of $118,050 from the Money Store, secured by a mortgage on the subject real property. In or about March of 2009, they defaulted on their mortgage payments. On July 31, 2009, plaintiff, the holder of the note and mortgage, commenced this foreclosure action. The first of nine mandatory settlement conferences pursuant to CPLR 3408 (a) was held on June 23, 2010.

In an order dated March 20, 2012, Supreme Court found that plaintiff, in violation of CPLR 3408 (f), failed to negotiate with defendant Barclay in good faith to reach a mutually agreeable resolution during the settlement conferences, and ordered a hearing "to better determine the extent of the bad faith and the appropriate sanctions." After conducting a hearing, by order dated June 21, 2013, the court, among other things, barred plaintiff from collecting any arrears incurred from July 7, 2011, including interest and late fees, until the date Barclay is given a final supported determination of her loan modification application and the case is released from the settlement part. Considering the totality of the circumstances, we now hold that plaintiff's conduct did not thwart any reasonable opportunities to settle the action and was not so egregious as to warrant the imposition of sanctions against it.

CPLR 3408 was enacted in 2008, as part of the omnibus Subprime Residential Loan and Foreclosure Laws (L 2008, ch 472 [eff Aug. 5, 2008]), remedial legislation intended to assist homeowners at risk of losing their homes to foreclosure due to the subprime credit crisis (*see* Sponsor's Mem, Bill Jacket, L 2008, ch 472). As part of the protections afforded to homeown-

ers by the legislation, CPLR 3408 requires that conferences be conducted in residential foreclosure actions

"for the purpose of holding settlement discussions pertaining to the relative rights and obligations of the parties under the mortgage loan documents, including, but not limited to determining whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be modified or other workout options may be agreed to, and for whatever other purposes the court deems appropriate" (CPLR 3408 [a]).

These mandatory settlement conferences are intended to "provide an opportunity for borrowers and lenders to try to reach a solution that avoids foreclosure" (*see* Letter from Senator Farley, Bill Jacket, L 2008, ch 472 at 6).

CPLR 3408 (f), added in 2009 as part of legislation designed to provide broader protection for homeowners (L 2009, ch 507 [eff Feb. 13, 2010]), states that "[b]oth the plaintiff and defendant shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible." "The purpose of the good faith requirement is to ensure that both plaintiff and defendant are prepared to participate in a meaningful effort at the settlement conference to reach resolution" (Governor's Program Bill Mem, Bill Jacket, L 2009, ch 507 at 11). The language of the statute and legislative history confirm that the obligation to negotiate in good faith is intended to be a two way street, imposing reciprocal obligations on both the lender and the borrower to cooperate with the other to enable achievement of a reasonable resolution (*see US Bank N.A. v Sarmiento*, 121 AD3d 187, 204 [2d Dept 2014] ["Where a plaintiff fails to expeditiously review submitted financial information, sends inconsistent and contradictory communications, and denies requests for a loan modification without adequate grounds, or, conversely, where a defendant fails to provide requested financial information or provides incomplete or misleading financial information, such conduct could constitute the failure to negotiate in good faith to reach a mutually agreeable resolution"]). Towards this end, 22 NYCRR 202.12-a (c) (4) directs the court to "ensure that each party fulfills its obligation to negotiate in good faith."

The term "good faith" is not defined in the statute. However, this Court has held that compliance with the good faith require-

ment of CPLR 3408 is not established by merely proving the absence of fraud or malice on the part of the lender and that "[a]ny determination of good faith must be based on the totality of the circumstances," taking into account that CPLR 3408 is a remedial statute (*Wells Fargo Bank, N.A. v Van Dyke*, 101 AD3d 638, 639 [1st Dept 2012]; *see also Sarmiento*, 121 AD3d at 203-204 ["'(T)he issue of whether a party failed to negotiate in 'good faith' within the meaning of CPLR 3408 (f) should be determined by considering whether the totality of the circumstances demonstrates that the party's conduct did not constitute a meaningful effort at reaching a resolution"]).

"While the aspirational goal of CPLR 3408 negotiations is that the parties 'reach a mutually agreeable resolution to help the defendant avoid losing his or her home' (CPLR 3408 [a]), the statute requires only that the parties enter into and conduct negotiations in good faith (*see* subd [f])" (*Van Dyke*, 101 AD3d at 638). In *Van Dyke*, this Court noted that "there are situations in which the statutory goal is simply not financially feasible for either party" and that

> "the mere fact that plaintiff refused to consider a reduction in principal or interest rate does not establish that it was not negotiating in good faith. Nothing in CPLR 3408 requires plaintiff to make the exact offer desired by [the] defendant[ ] [mortgagors], and the plaintiff's failure to make that offer cannot be interpreted as a lack of good faith" (*id.*; *see also Wells Fargo Bank, N.A. v Meyers*, 108 AD3d 9, 20 [2d Dept 2013] ["it is obvious that the parties cannot be forced to reach an agreement, CPLR 3408 does not purport to require them to, and the courts may not endeavor to force an agreement upon the parties"]).

Guided by these principles, we find that Barclay has not established that, under the totality of the circumstances, plaintiff failed to engage in a meaningful effort at reaching a solution during the settlement conferences. Although plaintiff presented Barclay with repeated requests for documentation and, at times, failed to timely comply with deadlines issued by the court, the record establishes that Barclay created a moving target for plaintiff by repeatedly changing her alleged sources of income in her loan modification applications, and failing to disclose substantial and material liens encumbering the property.

Barclay's September 13, 2010 application reported $3,543 in monthly income, $2,096 of which came from co-borrower Hog-

gard. As to Barclay's earnings, the application was supported by a letter from a restaurant which stated that "Barclay is employed here part-time as a cook. She is paid $150.00 weekly." Hoggard's income was not documented. In her January 14, 2011 application, Barclay reduced her monthly income to $2,253.75, and did not include any income attributable to Hoggard. Although Barclay's 2009 tax return showed $7,200 in business income, it did not include a schedule C or C-EZ or report any wages, salaries, tips, or Social Security benefits. An email from the attorney who later became Barclay's counsel stated that Barclay "is not self-employed and does not file taxes as self-employed," and that her income came from her restaurant job.

In her February 16, 2011 Home Affordable Modification Program (HAMP) application and her March 11, 2011 in-house loan modification application, Barclay increased her household monthly income to $4,328, of which $2,541 was attributed to Barclay's sister, who had never been mentioned in prior applications. Barclay's counsel, retained after the fourth settlement conference, acknowledged this material shift in Barclay's position as to her sources of income, stating:

> "In previous applications, [Barclay] did not report her sister's income even though her sister has lived in the home for 20 years; she did not know that she could contribute non-borrower information. Also, Ms. Barclay submitted Curtis Hoggard's tax information even though Mr. Hoggard does not live in the home and does not contribute toward the mortgage; she thought she had to contribute his information because he was a co-borrower. Additionally, she no longer works part-time at the restaurant."

These significant changes in the source and amount of Barclay's income warranted requests for further information and contributed to the delays in completing the review of Barclay's loan modification applications. Once Barclay's sister was belatedly listed and Hoggard was removed as a source of income, it was appropriate for plaintiff to review Barclay's applications anew. Indeed, at the April 5, 2011 conference, the parties stipulated that plaintiff would provide additional documentation that was needed. Barclay then submitted her May 29, 2011 application in which monthly income was reduced from $4,328 to $3,442.

Significantly, in each of the applications that Barclay submitted she failed to disclose all of the material aspects of her fi-

nances, including but not limited to the substantial liens against the property. Among other items, on January 29, 2004, Barclay was convicted of conspiracy to commit bank fraud (18 USC § 371) and bank fraud (18 USC § 1344), and ordered to pay $220,000 in restitution. On February 22, 2005, this was recorded as a $224,224 lien against the property in favor of the "DEPT OF JUSTICE U.S. ATTORNEY'S OFFICE." On February 12, 2010, Barclay executed a bond and mortgage in the principal sum of $200,000 against the property in favor of the Commissioner of Social Services of the City of New York. The mortgage was recorded on May 12, 2010. Although Barclay certified under penalty of perjury that all of the information in her loan modification applications was truthful, she did not disclose these liens. Rather, the only lien she disclosed was in the amount of $18,408.49 in favor of Beneficial Finance.

Barclay contends that the delays from the time she submitted her May 29, 2011 loan modification application are entirely plaintiff's fault. Barclay points to plaintiff's failure to issue a determination on that application within 30 days, as required by the court and HAMP guidelines. Barclay also notes that while plaintiff claimed at the July 7, 2014 conference that documents were still missing, it admitted in a July 12, 2014 email, sent four days after the deadline set by the court, that all necessary documents had been provided. However, at the August 30, 2011 CPLR 3408 (f) hearing, plaintiff advised Barclay that its title search revealed that $229,000 in judgments and liens had been levied against the property, including the $220,224 due pursuant to the restitution order, and that a quitclaim deed was required from Hoggard, a reasonable request given that his income had been excluded. The court then adjourned the hearing to October 18, 2011, to allow Barclay to address the liens and provide the deed.

Upon being advised of the specific liens on the property, Barclay continued to deny that the federal lien arising out of her fraud conviction pertained to her. While the federal lien was for $224,000 and Barclay was aware of the restitution order, she directed plaintiff's attention to a $1,063.22 tax lien that was patently irrelevant. When plaintiff's counsel provided proof that the $224,000 lien was levied against Barclay, and that documented liens exceeded $400,000, Barclay continued to assert that the federal lien did not pertain to her and failed to provide proof that the other liens had been satisfied. It was not until the June 8, 2013 hearing that Barclay's counsel acknowledged

the federal lien, at which time she maintained, without submitting supporting documentation, that the U.S. Attorney had agreed to subordinate it.

Barclay contends that the liens should not be a factor because the issue was not raised until after she moved to dismiss. However, this does not alter the fact that Barclay concealed material information about her financial circumstances, in all of the loan modification applications, which required her to list all of her income, assets, liabilities and expenses, including all "liens/mortgages or judgments on this property." These omissions affected both the continued viability of the property as suitable collateral for a mortgage loan, and her ability to repay. Plaintiff's contention that she ultimately acknowledged the lien and that the U.S. Attorney agreed to subordinate the lien does not abrogate her prior lack of good faith in failing to disclose the federal lien and then attempting to deny that it pertained to her.

Supreme Court gave no weight to Barclay's conduct, ignoring the reciprocal obligations imposed by CPLR 3408 (f). While this Court is mindful of the remedial nature of CPLR 3408, the goals of the statute would not be served if we were to ignore the role that Barclay's own conduct played in delaying a resolution of this action.

In light of the foregoing, we need not consider plaintiff's alternative arguments that even if the lack of good faith finding is supported by the record, the court lacked the statutory or regulatory authority to impose sanctions under CPLR 3408, and that in any event the sanctions imposed impermissibly rewrote the terms of the parties' loan agreement and were excessive.

Accordingly, the order of the Supreme Court, Bronx County (Robert E. Torres, J.), entered July 22, 2013, which found that plaintiff had not negotiated in good faith pursuant to CPLR 3408 (f), and the order, same court, Justice and entry date, which, to the extent appealed from as limited by the briefs, barred plaintiff from collecting any interest from July 7, 2011 until the date of a final, supported determination on Barclay's application for a loan modification and the release of this case from the settlement part, should be reversed, on the law, without costs, and the orders vacated.

Tom, J.P., Renwick, DeGrasse and Kapnick, JJ., concur.

Orders, Supreme Court, Bronx County, entered July 22, 2013, reversed, on the law, without costs, and the orders vacated.